UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| CAL FRUIT INTERNATIONAL, INC., | NO. CIV. 04-2494 FCD KJM |
| Plaintiff, | |
| | MEMORANDUM AND ORDER |
| JEANNE SPAICH; INTERNAL REVENUE SERVICE; and DOES 1-20, | |
| Defendants. | |

----oo0oo----

This matter is before the court on interpleader defendant Internal Revenue Service's ("IRS" or "the government") motion for summary judgment[1] regarding interpleader defendant Jeanne Spaich's ("Spaich") claim to the interpleader funds pursuant to Federal Rule of Civil Procedure[2] 56. The government's claim to the proceeds of the sale of prunes to plaintiff Cal Fruit

---

[1] Because oral argument will not be of material assistance, the court orders the matter submitted on the briefs. E.D. Cal. L.R. 78-230(h).

[2] Any further references to a "Rule" or "Rules" are to the Federal Rules of Civil Procedure unless otherwise indicated.

1

International, Inc. ("Cal Fruit") arises from various federal tax assessments against CalPrune, a corporation formed and owned by defendant Spaich's father, Gavrillo Spaich. Spaich's claim arises from her allegation that she is the owner of the prunes sold to plaintiff and that her father was merely acting as her agent; therefore, she contends the funds should be distributed to her rather than to the government to pay the IRS' tax levy.

## BACKGROUND[3]

### A.  CalPrune's Tax Liability

Gavrillo Spaich, Jeanne Spaich's father, has been in the business of growing and selling fruit in his own name and through various business entities since 1972. (RUF ¶ 1). In 2003, Mr. Spaich filed a petition for personal bankruptcy. (RUF ¶ 2). Also in 2003, Mr. Spaich formed a corporation named CalPrune, for which he was the sole owner, sole officer, and president. (RUF ¶¶ 3-4). CalPrune grew and processed prunes. (RUF ¶ 5). CalPrune had no equipment, no inventory, and no land; the land that CalPrune utilized was leased personally to Mr. Spaich and CalPrune reimbursed him the $40,000 monthly lease payments by paying that amount to the lessor. (RUF ¶ 6). At times, CalPrune had upwards of 30 employees. (RUF ¶ 7). It is unclear whether CalPrune was profitable in 2003, but by 2004, the situation had worsened and CalPrune's employees were laid off during the fourth quarter of 2004. (RUF ¶¶ 8-9).

At least as early as the first quarter of 2004 (ending March 31, 2004), employment taxes owed by CalPrune to the United States

---

[3] Except where noted, the facts of this case are undisputed. For the purposes of this motion, where the facts are disputed, the court recounts Spaich's version of the facts. (See Def. Spaich's Response to United States' Separate Stmt. of Undisp. Facts ("RUF"), filed Aug. 31, 2006).

2

were substantially in arrears, and CalPrune had amassed substantial unpaid obligations to the United States. (RUF ¶ 10). By Mr. Spaich's own admission, in a late-filed return received by the IRS on or about September 22, 2004, CalPrune had a total employment tax liability of $100,656.73 for the first quarter of 2004 and $65,811.27 for the second quarter of 2004, excluding interest and penalties for late filing and untimely payment. (RUF ¶¶ 10, 12). The payroll taxes for the first quarter of 2004 were paid in full shortly after the second quarter return was filed in September 2004. (RUF ¶ 12). On October 8, 2003, an assessment against CalPrune was made for employment taxes due and owing in the amount of $52,383.10 for the third quarter of 2004. (RUF ¶ 15). Spaich asserts that this assessment is only an estimate of taxes, made prior to the return due date of October 31, 2004, and that it is not based upon any articulated statement by anyone knowledgeable about the corporation's third quarter employment. (RUF ¶ 15). Spaich also asserts that CalPrune filed its monthly payroll tax returns for the third quarter, but that the IRS and the United States has simply ignored the filings and continues to assert what it knows to be an erroneous balance due. (RUF ¶ 15).

**B.   Jeanne Spaich's Asserted Right to the Prunes**

Defendant Jeanne Spaich asserts that on April 4, 2004, her father gifted twelve hundred (1,200) tons of prunes that were the subject of a contract with Mariani, a fruit company, for her 21st birthday. (RUF ¶ 27). The Government contends that CalPrune owned the prunes that were gifted to defendant Spaich. Defendant Spaich contends that ownership of the prunes at issue is disputed. After the value of the prunes went up, a deal with

3

Mariani was struck, whereby the contract buyer would obtain about 300[4] tons of prunes from Mariani in exchange for opting not to exercise rights to purchase the remaining 900 tons at what had become a below market price. (Dep. of Gavrilo Spaich ("G. Spaich Dep."), Ex. 1 to Def. Spaich's Opp'n to United States' Mot. for Summ. J ("Opp'n"), filed Aug. 31, 2006, at 64:17-66:15; Dep. of Jeanne Spaich ("J. Spaich Dep."), Ex. 2 to Opp'n, filed Aug 31, 2006, at 89:7-14). Subsequently, CalPrune bought Spaich's 300 tons of prunes for a promise to pay her $500,000. (RUF ¶ 29). However, she only received $100,000 and an additional amount of prunes (405,980 pounds) worth about $89,000, the exact quantity of prunes that were later sold to Cal Fruit International, Inc. ("Cal Fruit") on September 9, 2006. (RUF ¶¶ 29, 36). Spaich is still owed money from this transaction. (G. Spaich Dep. 61:23-24). Spaich admits that she never physically saw or inspected the prunes, did not know where the prunes were stored, and did not know whether the prunes at issue were in the field, whether they were process, or whether they were packed. (RUF ¶ 31). Spaich never took any steps to sell the prunes because her father was contacting potential buyers. (RUF ¶ 32).

At some point during the late summer of 2004, Gavrillo Spaich contacted Cal Fruit, seeking to sell prunes. (RUF ¶ 16). The prunes were delivered to Cal Fruit on September 9, 2004, after having been weighed at CalPrune's facilities. (RUF ¶ 17).

---

[4] While defendant Spaich did not contest the government's assertion that she received 300 tons of prunes under the Mariani contract, there appears to be some uncertainty based upon the court's review of Spaich's Statement of Disputed Facts which asserts that she received approximately 400 tons of prunes. (See Def. Spaich's Am. Opp'n to the United States' Mot. for Summ. J. (Am. Opp'n), filed Sept. 19, 2006, ¶¶ 33-34). However, the exact number of prunes is irrelevant to the issues presently before the court.

4

After brown rot was discovered on some of the fruit, the final quantity of fruit sold was 405,980 pounds for a price of $89,315.60. (RUF ¶ 17). Cal Fruit was not aware that Jeanne Spaich was the seller of the fruit until it received the invoice from Jeanne Spaich. (RUF ¶ 19).

## C. The Current Action

The IRS served a levy upon Cal Fruit, dated September 17, 2004, relating to first quarter employment taxes owed by CalPrune, which at the time remained due and owing. (RUF ¶ 20). Thereafter, the IRS served a second levy, dated September 27, 2004, relating to second quarter employment taxes owed by CalPrune. (RUF ¶ 22). Rather than pay the IRS levy, plaintiff filed this interpleader action, depositing said funds with the court and seeking a determination as to who is entitled to the funds. (Compl. In Interpleader, filed Nov. 5, 2004).[5] Specifically, plaintiff alleges that it does not know the identity of the seller of the prunes, whether it was CalPrune (Gavrillo Spaich) or Jeanne Spaich. Both the government and Spaich filed claims to the interplead funds.

### STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings,

---

[5] The complaint was originally filed in Sutter County Superior Court, and subsequently removed to this court.

5

>     depositions, answers to interrogatories, and admissions on file together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id. at 324.  Indeed, summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-289 (1968).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing

law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Id. at 251-52.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank, 391 U.S. at 289. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982). The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a

whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586-87, 106 S. Ct. at 1356.

**ANALYSIS**

**A.   Ownership of the Prunes**

Each party claiming entitlement to interpled funds bears the burden of proving, by a preponderance of the evidence, that it is entitled to the funds. Midland Ins. Co. v. Friedgood, 577 F. Supp. 1407, 1411 (S.D.N.Y. 1984). In this case, determining entitlement to the funds at issue requires a determination of the ownership of the 405,980 pounds of prunes sold to Cal Fruit on September 9, 2004.

The government asserts that it has a right to the funds at issue because the prunes were the property of CalPrune. Pursuant to § 6321 of the Internal Revenue Code, "[i]f any person liable to pay any tax neglects or refuses to pay the same after demand, the amount . . . shall be a lien in favor of the United States upon all property and rights to property . . . belonging to such person." 26 U.S.C. § 6321 (West 2006). Spaich argues that the government does not have a right to the funds at issue because the prunes sold to Cal Fruit did not belong to CalPrune, but belonged to her; therefore, the proceeds of the sale should be distributed to her.

**1.   Nominee Status**[6]

---

[6] Spaich argues that the court should not consider this argument because it was raised as a new issue in the government's motion for summary judgment. However, in its Answer and Claim filed on January 13, 2005, the government denied that Jeanne Spaich sold the prunes at issue to Cal Fruit or that she performed any contractual conditions or promises relating to the sale. The United States averred that the "true seller" of the
(continued...)

8

The government contends that Jeanne Spaich was merely a nominee for CalPrune and Gavrilo Spaich, as the sole owner and president of CalPrune.  In seeking to satisfy legitimate tax debts, the government may levy on property held by an individual who is merely the nominee of the taxpayer.  26 U.S.C. §§ 6321, 6331; see G.M. Leasing Corp. v. United States, 429 U.S. 338, 350-51 (1977) (holding that § 6321 allows the government to impose a lien on property in the hands of a third party straw man and that § 6331 permits a levy upon such property); United States v. Bell, 27 F. Supp. 2d 1191, 1195 (E.D. Cal. 1998); see also United States v. Miller Bros. Constr. Co., 505 F.2d 1031 (10th Cir. 1974) (finding that legal title holder was merely the nominee of the tax payer and government had interest in land); Towe Antique Ford Found. v. I.R.S., 791 F. Supp. 1450, 1454 (D. Mont. 1992) (finding that corporation was the nominee and alter ego of the taxpayer and government levy was justified); United States v. Marsh, 114 F. Supp. 2d 1036, 1043 (finding that trust held funds as nominee of taxpayer and liens could be foreclosed against properties).  "State law governs the determination of whether there exists an alter ego from whom the government may satisfy the obligation of a taxpayer."  Wolfe v. United States, 806 F.2d 1410, 1411 (9th Cir. 1986).  There appear to be no reported California decisions which address the issue of what factors are relevant in determining whether an individual is a nominee of a taxpayer.  However, other courts to analyze this issue have

---

[6](...continued)
prunes was CalPrune.  As such, Spaich was on notice that the government would be advancing legal theories in support of its assertion that Spaich was not the true owner or seller of the prunes and that Spaich was merely a nominee or fraudulent transferee.

9

considered the following factors to be relevant in determining nominee status:

    (a)    No consideration or inadequate consideration paid by the nominee;

    (b)    Property placed in the name of the nominee in anticipation of a suit or occurrence of liabilities while the transferor continues to exercise control over the property;

    (c)    Close relationship between transferor and the nominee;

    (d)    Failure to record conveyance;

    (e)    Retention of possession by the transferor; and

    (f)    Continued enjoyment by the transferor of benefits of the transferred property.

Bell, 27 F. Supp. 2d at 1195 (citing Towe, 791 F. Supp. at 1454; United States v. Williams, 581 F. Supp. 756, 759 (N.D. Ga. 1982); United States v. Code Prod. Corp., 216 F. Supp. 281 (E.D. Pa. 1963)).

The government argues that the application of these factors to the facts in this case demonstrate by a preponderance of the evidence that Spaich was merely a nominee for CalPrune and Gavrilo Spaich. As an initial matter, both Gavrilo Spaich and Jeanne Spaich testified at their depositions that the prunes that were given to Jeanne Spaich on her 21st birthday were prunes that were the subject of the Mariani contract. (J. Spaich Dep. 57:11-23; 62:19-65:3; G. Spaich Dep. 62:1-17). The Mariani contract was a contract between Mariani Packaging Co. and CalPrune to sell prunes to CalPrune. Therefore, the prunes and other rights under the contract were CalPrune's to give.

The rights to the Mariani contract were given as a gift to defendant Spaich for her 21st birthday. The gift was given by Gavrilo Spaich, the sole owner, sole officer, and president of

10

CalPrune, to his daughter, Jeanne Spaich. There was no consideration for this transfer. The rights to the contract were given to defendant Spaich in April 2004. By that time, Gavrilo Spaich had already filed for bankruptcy, and by the end of April 2004, CalPrune owed over $100,000 in employment taxes for the first quarter. CalPrune subsequently amounted debt to the government for employment taxes due in the second and third quarter of 2004. The 300 tons of prunes that were given to defendant Spaich under the Mariani contract were sent to the facility at CalPrune. (G. Spaich Dep. 69:19-70:1). Spaich then sold these 300 tons of prunes back to CalPrune, in exchange for both money and an amount of prunes worth about $90,000.[7] Spaich never saw these prunes, never inspected the prunes, did not know where the prunes were stored, and did not know whether the prunes were in the field, processed, or packed. Spaich never took any steps to sell these prunes because her father was contacting any potential buyers. Gavrilo Spaich negotiated the contract with Cal Fruit for the sale of the 405,980 pounds of prunes for approximately $90,000, the proceeds of which are at issue in this case. Cal Fruit was not aware that Jeanne Spaich was the seller of the prunes until it received the invoice from her after the prunes had been sold and delivered.

Defendant Spaich does not contest any of these facts. Rather, in her opposition to the government's motion for summary judgment, she asserts that each of the factors in determining whether she was merely a nominee for CalPrune "represent material issues" and that "facts associated with each of these factors

---

[7] However, Spaich has not yet been paid in full for the purchase of these prunes by CalPrune or Gavrilo Spaich. (Am. Opp'n ¶ 35).

11

have not been promulgated in the development of evidence in this case." (Opp'n at 7). Therefore, she summarily asserts that "there are genuine issues of material fact." However, Spaich does not point to any other relevant "facts associated with each of these factors," nor does she point to any dispute in the facts upon which the government relies in making its argument that this was merely a nominee transfer. Defendant Spaich's conclusory allegations that there are triable issues of material fact without citation to of demonstration of specific triable issues is insufficient to rebut the government's proffered evidence and preclude summary judgment.

The circumstances set forth above support the government's contention that the true and equitable owner of the prunes sold to Cal Fruit was CalPrune. Jeanne Spaich paid no consideration for the Mariani contract or the 300 tons of prunes received as a result of that contract. Spaich then sold the 300 tons of prunes to CalPrune for approximately 400,000 pounds of prunes and money which she has still not been paid in full. Spaich never saw these prunes and was not involved in the subsequent negotiation, sale, or delivery of the prunes to Cal Fruit. Based upon these undisputed facts, the court finds that the true owner of the prunes sold to Cal Fruit was CalPrune, and therefore, the government is entitled to attach the proceeds of that sale in order to satisfy CalPrune's tax liabilities.

**2.   Fraudulent Conveyance**

The government also argues that the gift of the prunes to Jeanne Spaich was a fraudulent conveyance, and therefore should be deemed invalid. The court must look to state law to determine whether there was a fraudulent conveyance. See Colby B. Found.

12

v. United States, 166 F.3d 1217 (9th Cir. 1999).  "A fraudulent conveyance is a transfer by the debtor of property to a third person undertaken with the intent to prevent a creditor from reaching the interest to satisfy a claim." Yaesu Electronics Corp. v. Tamura, 28 Cal. App. 4th 8, 13 (1994).  Pursuant to California's Uniform Fraudulent Transfer Act

> a transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . , if the debtor made the transfer . . . with the actual intent to hinder, delay, or defraud any creditor of the debtor.

Cal. Govt. Code § 3439.04 (West 2006).  In determining actual intent for purposes of this section, the statute provides that consideration may be given to these factors, among others:

> (1) Whether the transfer or obligation was to an insider;
> (2) Whether the debtor retained possession or control of the property transferred after the transfer;
> (3) Whether the transfer or obligation was disclosed or concealed;
> (4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> (5) Whether the transfer was of substantially all the debtor's assets;
> (6) Whether the debtor absconded;
> (7) Whether the debtor removed or concealed assets;
> (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> (9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> (10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred; and
> (11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred assets to an insider of the debtor.

Cal. Govt. Code § 3439.04.  Because "the real intent of the parties and the facts of a fraudulent transaction are peculiarly within the knowledge of those sought to be charged with fraud," actual and direct "proof of a transfer and of fraudulent intent is often an impossibility." Menick v. Goldy, 131 Cal. App. 2d

13

542, 548 (1955). Therefore, proof of intent must often be inferred "from circumstances surrounding the transaction, the relationship and interest of the parties." Id. (citing Taylor v. Osborne-Fitzpatrick Fin. Co., 57 Cal. App. 2d 656, 661 (1943); Burns v. Radoicich, 77 Cal. App. 2d 697, 702 (1947)).

The undisputed facts of this case establish that the prunes at issue were fraudulently conveyed from CalPrune to Jeanne Spaich. The prunes under the Mariani contract were given by Gavrilo Spaich, on behalf of CalPrune, to his daughter Jeanne Spaich for no consideration. See Menick, 131 Cal. App. 2d at 547 (stating that "the relationship between parent and child, when coupled with other suspicious circumstances, may be sufficient to raise an inference of fraud in the conveyance"). Subsequently, CalPrune appropriated the 300 tons of prunes that resulted from this contract from Jeanne Spaich in return for a cash payment that has yet to be paid in full and for over 400,000 pounds of prunes that were later sold to Cal Fruit. CalPrune always maintained possession of the prunes and Gavrilo Spaich handled all aspects of the sale to Cal Fruit, excepting the typing of an invoice, which was performed by Jeanne Spaich. The transfers between CalPrune and Jeanne Spaich occurred while CalPrune was amassing significant unpaid taxes to the IRS, and CalPrune continued to amount tax debt for the first, second, and third quarters of 2004. These circumstances demonstrate that CalPrune fraudulently conveyed the prunes at issue to Jeanne Spaich with the intent to prevent the government from reaching the proceeds of the sale to Cal Fruit. Therefore, the government is entitled to levy upon the proceeds of the sale of prunes to Cal Fruit to satisfy CalPrune's federal tax liabilities.

**B.    Amount of CalPrune's Tax Liability**

Defendant Spaich contends that even if the government is entitled to the funds at issue, the government has not properly accounted for the tax liabilities owed by CalPrune to the IRS. Specifically, Spaich contends that (1) tax levies that were served on a company which bought prunes from CalPrune, Fresh Pacific, were misapplied to another Spaich family company instead of CalPrune; and (2) the tax liability for the third quarter was overestimated by the government and has not been corrected.

**1.    Fresh Pacific Levies**

Spaich asserts that Fresh Pacific owed monies to CalPrune for prunes it had purchased. (Am. Opp'n ¶ 5). The IRS, through Revenue Officer Ben Dotson, served levies on Fresh Pacific for CalPrune's federal tax liabilities. (Am. Opp'n ¶ 6). A representative of Fresh Pacific called Mr. Spaich to determine the proper employer (tax) identification number of the identity with which it had transacted business, and Mr. Spaich inadvertently gave Fresh Pacific the employer identification number for California Prune Packing Company, a Spaich family business, rather than CalPrune, the seller of the prunes. (Am. Opp'n ¶¶ 9-10). The IRS applied some of the money owed by Fresh Pacific to the federal payroll tax liabilities of California Prune Packing, instead of applying all of the money to CalPrune's tax liabilities. (Am. Opp'n ¶ 7). Defendant Spaich contends that had the funds been properly applied against the liabilities of CalPrune, the liabilities of CalPrune would have been overpaid. (Am. Opp'n ¶ 19).

The government argues that defendant Spaich is barred from challenging the application of the proceeds obtained through the

15

levies served on Fresh Pacific.  Section 7426 of the Internal Revenue Code allows suit by a third party seeking recovery of levied-upon property in which that third party claims an interest.  <u>See</u> 26 U.S.C. § 7426(a) (West 2006).  However, such an action must be filed within nine months from the date of the levy at issue.  <u>See</u> 26 U.S.C. § 6532(c)(1) (West 2006).  The levy is dated from when the IRS served the notice of levy on the possessor of that property.  <u>See</u> 26 C.F.R. § 301.6331-1(a)(1) (West 2006); <u>United States v. Donahue</u>, 905 F.2d 1325, 1329-30 (9th Cir. 1990).  The Fresh Pacific levies were dated in October and November of 2004.  Defendant Spaich failed to challenge these levies within the statutory limit, and therefore, the government contends that she is barred from challenging the proceeds of these levies.

   Spaich contends that she is not making a claim for the funds obtained through levy; rather, she is raising the issue that the United States had not properly accounted for liabilities owed by CalPrune to the IRS.  This re-characterization does not change the fact that Spaich is seeking a determination that levy proceeds were wrongfully applied against one taxpayer, California Prune Packaging, and should instead be applied to the benefit of another taxpayer, CalPrune.  This is the type of challenge and remedy contemplated by 26 U.S.C. § 7426, and Spaich cannot make an end-run around the applicable limitations period and her failure to file such a claim by re-characterizing her claim in this manner.  As such, defendant Spaich is barred from challenging the application of the proceeds obtained through the IRS levies on Fresh Pacific.

///

### 2. CalPrune's Tax Liability for the Third Quarter of 2004

Defendant Spaich also asserts that there are genuine issues of material fact regarding CalPrune's tax liability for the third quarter of 2004. The government asserts that the total tax liability of CalPrune as of May 31, 2006, is $146,092.74,[8] combining the remaining tax liability for the second quarter 2004 of $77,540.41 with the tax liability for the third quarter 2004 of $68,552.33. (RUF ¶ 23). Defendant Spaich contends that the liabilities assessed against CalPrune for the third quarter were estimated. Spaich asserts that on December 5, 2005, duplicate copies of the monthly payroll tax returns for July, August, and September of 2004 were submitted to the United States, showing a total liability of $48,694.00 for the third quarter.[9] The government has not amended the assessment.

Even if the court accepts defendant Spaich's assessment of third quarter liability, CalPrune still owes the government $126,234.41. The funds at issue in this interpleader action amount to $89,315.60 in total. Regardless of whether CalPrune owes the government $146,092.74 or $126,234.41, the government has shown by a preponderance of the evidence that they are entitled to the entirety of the funds at issue in this case.

### C. Attorneys' Fees

The government also seeks summary judgment regarding whether plaintiff is entitled to retain its attorneys fees and costs associated with bringing the interpleader action where, as here,

---

[8] The government noted that this amount does not include interest, penalties, and other statutory additions if payment is made after May 31, 2006.

[9] Except for the assertion that the Fresh Pacific levies should have been applied to CalPrune, Spaich does not appear to dispute the amount of tax liability for the second quarter.

17

doing so would diminish the recovery of the United States. In Abex Corp. v. Ski's Enterprises, Inc., the Ninth Circuit held that an award of attorneys' fees to private parties in an interpleader action was improper because it drained the interpleader funds before the tax liens were satisfied. 748 F.2d 531, 517 (9th Cir. 1984). Federal tax liens have priority to the interpleader fund, and must be fully satisfied before any award of attorney fees is allowable. See Escobar v. I.N.S., 813 F.2d 283, 285 n.2 (9th Cir. 1987). Therefore, because the amount of the federal tax liens exceeds the interpleader funds on deposit with the court, plaintiff is not entitled to recover any of its attorney fees and costs.

## CONCLUSION

For the foregoing reasons, the government's motion for summary judgment is GRANTED. Based upon the foregoing determination, the United States is entitled to the entirety of the interpleader funds held by the court. The Clerk of the Court is directed to close this file.

IT IS SO ORDERED.

DATED: September 21, 2006

/s/ Frank C. Damrell Jr.
FRANK C. DAMRELL, Jr.
UNITED STATES DISTRICT JUDGE